IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 16-50552-CAG |
| **PALMAZ SCIENTIFIC INC.,** | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | | |
| In re: | § | |
| | § | CASE NO. 16- 50555 |
| **ADVANCED BIO PROSTHETIC** | § | Chapter 11 |
| **SURFACES, LTD.,** | § | |
| | § | |
| Debtor. | § | |
| In re: | § | |
| | § | CASE NO. 16- 50556 |
| **ABPS VENTURE ONE, LTD.,** | § | |
| | § | Chapter 11 |
| Debtor. | § | |
| | | |
| In re: | § | |
| | § | CASE NO. 16- 50554 |
| **ABPS MANAGEMENT, L.L.C.,** | § | |
| | § | Chapter 11 |
| Debtor. | § | |

**DEBTORS' EMERGENCY MOTION FOR INTERIM
APPROVAL OF (1) POST-PETITION SECURED AND SUPER
PRIORITY FINANCING PURSUANT TO 11 U.S.C. §364(C) AND (D)
OF THE BANKRUPTCY CODE, (2) AUTHORITY FOR CONSENSUAL USE
OF CASH COLLATERAL AND (3) GRANT OF ADEQUATE PROTECTION**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Now come debtors Palmaz Scientific Inc. ("**PSI**"), Advanced Bio Prosthetic Surfaces,

Ltd. ("**ABPS**"), ABPS Venture One, Ltd. ("**Venture**"), and ABPS Management, L.L.C.

("**Management**" and together the "**Debtors**") and file this Debtors' Emergency Motion For

Interim Approval of Post-Petition Secured and Super Priority Financing Pursuant To Sections

364(c) and (d) Of The Bankruptcy Code, Authority for Consensual Use of Cash Collateral and Grant of Adequate Protection ("**Motion**"), and would respectfully show the Court as follows:

## I.
## RECOGNIZED FIRST DAY MOTION

1.      Pursuant to the Bankruptcy Court for the Western District of Texas's Standing Order on First Day Motions in Chapter 11 Cases, Order No. 01-4, this motion is a recognized first day motion (interim hearing only), which should be automatically set without the need for a motion for expedited or emergency consideration.

2.      Debtors are contemporaneously filing a Notice of Designation as Complex Chapter 11 Case pursuant to L. Rule 1020.1 and Exhibit A to the Local Rules because Debtors' total debt exceeds $10 million and there are more than 50 parties in interest in this case.

3.      Debtors are contemporaneously filing a Request For Emergency Consideration Of Certain "First Day" Matters pursuant to Exhibit A to the Local Rules, citing that Debtors believe this case qualifies as a Complex Chapter 11 Case and that Debtors need emergency consideration of this Motion.

4.      Debtors are contemporaneously filing a Motion for Entry of an Order Pursuant to Fed. R. Bankr. P. 1015(b) Directing Joint Administration of Cases**.**

## II.
## INTRODUCTION

5.      Debtors seek Court approval to incur post-petition debt other than in the ordinary course of business pursuant to 11 U.S.C. § 364, as provided for in the form of order attached to this Motion.  Debtors and their Prepetition Secured Lenders (as identified in Annex 3 to the DIP Term Sheet) have agreed to consensual use of cash collateral.  In exchange for the priming and super priority liens and use of cash collateral, Debtors and the Prepetition Secured Lenders have agreed on the adequate protection to be provided for such use.

## III.
## JURISDICTIONAL, CORE, AND VENUE ALLEGATIONS

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this district pursuant

to 28 U.S.C. §§ 1408 and 1409.

## IV.
## SUPPORT FOR THIS MOTION

7.      Debtors rely on the record in this case, including judicial notice of the filings in

this case, any evidence provided at any hearing on this Motion, and the following exhibits:

| Ex | Description |
|----|-------------|
| A | Proposed Order Granting Motion |
| B | Interim DIP Note |
| C | Term Sheet |
| D | Proposed DIP Budget |

## V.
## BACKGROUND

**A.**     **Chapter 11 Voluntary Petition Filed**

8.      On March 4, 2016 ("**Petition Date**"), PSI, ABPS, Venture, and Management as

debtors filed voluntary petitions commencing the above-captioned voluntary chapter 11 cases.

9.      Debtors continue to manage and operate their business as debtors-in-possession

pursuant to §§ 1107 and 1108 of the Bankruptcy Code.  No creditors' committee has been

appointed in these cases by the United States Trustee.  Further, no trustee or examiner has been

requested or appointed.

**B.**     **Declaration**

10.     A description of the background of Debtors and the events leading up to the filing

of the voluntary petition by Debtors are provided in the Unsworn Declaration Under Penalty of

Perjury of Dr. Eugene Sprague in Support of First Day Pleadings ("**Declaration**") which is incorporated by reference herein.

**C.**      **The Debtors' Business**

11.      PSI is a research and development company dedicated to the advancement of the technology and science of medical implants.  Many years of deliberate, systematic research have led PSI to a deeper understanding of the interaction of structured materials with biological fluids and tissues.  This has allowed PSI not only to delve into the current frontiers of implantable medical devices but into developing fields such as tissue engineering, artificial and semi-artificial organ replacement, and interactive implantable devices.

12.      Led by Dr. Julio Palmaz and a proven management team of executives, physicians, scientists, and engineers, PSI was created in 2008 with a vision to provide a technology platform that innovates medical device science.   Dr. Palmaz, a world renowned doctor, scientist, and inventor, is widely recognized as the father of the heart stent, identified as one of ten patents that changed the world. PSI continue the research and development activities begun in 1999 by Dr. Palmaz under ABPS, now a wholly-owned subsidiary of PSI.  Other than ABPS, PSI has two other direct affiliates: Venture, and Management.  PSI is the 100% member owner of Management.  Management serves as the General Partner and one percent limited partner in ABPS.  PSI owns the remaining 99% limited partnership interest in ABPS.  Further, PSI owns an 80% member interest in Venture.  The other 20% of Venture is owned by Dr. Steve Bailey.

13.      Today the vision of Dr. Palmaz to further his research and development activities is being realized and supported by over 250 issued United States and international patents and over 180 active U.S. and international pending patent filings on its technologies including thin-

film technologies and physical vapor deposition process innovations to produce more reliable implantable prosthetic devices. With an innovative approach to the design and manufacture of implantable materials, PSI is poised to leverage the intellectual property portfolio it owns indirectly through ABPS to create safer and more predictable implantable prosthetic devices.

14.     The extensive intellectual property portfolio is the foundation for a technology platform with many potential implantable medical devices, including stents that address coronary, peripheral, and intracranial indications as well as implantable devices in orthopedic and cosmetic prosthetic specialties. PSI believes it possible that any of these technologies could be commercialized independently or via collaborative relationships, including opportunities for licensing and engineering services as well as possible equipment sales and/or contract manufacturing.

15.     PSI, however, has no current source of revenue. It has not yet produced a medical device for mass production. Nor has it yet been able to generate revenue through the commercialization of its inventions with an appropriate partner. As an early stage start-up company, PSI has been able to fund its operations through a series of preferred stock offerings and secured financing provided by holders of equity, or parties related such holders, in PSI.

16.     The preferred stock and secured financings followed a path selected by PSI's former management, a path which has proved to be unsuccessful. New management, brought in just six of months ago, sought to change the direction of PSI and allow it to focus on commercialization of just a couple of key areas, rather than dividing its capital across several promising areas. But PSI's new management was hampered by a lack of capital and its plans could not be pursued without additional financing.

17.     PSI's new management team diligently sought additional financing over the last several months, but the existing capital structure and some existing litigation were regarded as impediments by investors and conventional lenders, and it was not possible for PSI to acquire additional financing.

18.     As a result, the Debtors filed these bankruptcy cases to seek an orderly liquidation to maximize the value of the assets, that may return sufficient value to pay their creditors. It is not anticipated that the orderly liquidation and sale of the assets will generate sufficient proceeds to provide a return to the holders of equity in PSI's capital structure.

**D.     Secured Creditors**

19.     As set forth above, Debtors have no current source of revenue, and as a start-up, to fund their operations prepetition, Debtors relied upon their equity owners to provide secured financing when conventional financing was unavailable. Pre-bankruptcy, Debtors entered into the following pre-petition secured financing arrangements:

a)      Promissory Note pay to the order of Lennox Capital Partners, LP with Allonge pay to the order of Oak Court Partners, Ltd. in the original principal amount of $1,000,000 dated July 24, 2014.

b)      Promissory Note pay to the order of Lennox Dallas Partners, LP with Allonge pay to the order of Oak Court Partners, Ltd. in the original principal amount of $1,500,000 dated July 24, 2014.

c)      Draw Note pay to the order of Julio Palmaz in an amount up to $1,000,000 dated June 2, 2015.

d)      Convertible Draw Note pay to the order of Oak Court Partners, Ltd. in an amount up to $4,500,000 dated June 16, 2015.

e)      Convertible Draw Notes pay to the order of Oak Court Partners, Ltd. in an amount up to $3,000,000 dated September 17, 2015.

f)      Draw Note pay to the order of Oak Court Partners, Ltd. in an amount up to $1,500,000 dated December 30, 2015.

20.     Affiliates of Dr. Palmaz own a majority interest in Oak Court Partners, Ltd.  In addition to being a shareholder and creditor of the Debtors, Oak Court Partners, Ltd. indirectly owns Vactronix Scientific, Inc. the proposed Lender under the DIP Facility.

21.     As of the Petition Date, the aggregate amount of secured pre-petition indebtedness was no less than $12,500,000 (the "**Prepetition Secured Obligations**").  Julio Palmaz and Oak Court Partners are collectively referred to as the "Prepetition Secured Parties."

22.     Prior to the Petition Date, Debtors anticipated that without continuing liquidity, the value of their assets would rapidly diminish and their key employees, who constitute virtually the only people in the world who understand how to operate, rebuild, calibrate, adjust, and otherwise use Debtors' highly specialized equipment valued at approximately $1.8 million on their books, would leave.  Debtors believe that any potential bidder for Debtors' assets will realize substantially more value from the assets with these key employees than without them, thus evidencing the need for post-petition financing.

## VI.
## FED. R. BANKR. P. 4001(C)(B) REQUIREMENTS

23.     The Motion requests entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "**Interim Order**") and a final order (a "**Final Order**") pursuant to sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), and in accordance with Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"):

(i) Authorizing Debtors to obtain post-petition financing (a) in an aggregate amount of up to $1,600,000 on an interim basis (the "**Interim DIP Financing**"), and (b) in a total aggregate principal amount of up to $2,000,000.00 on a final basis (the "**Final DIP**

Financing" and, collectively with the Interim DIP Financing, the "**DIP Financing**") from Vactronix Scientific, Inc. or its designee (in such capacity, "**Lender**");[1]

(ii) authorizing and approving the Debtors to (a) execute the post-petition financing promissory note in substantially the form attached hereto as **Exhibit B** (the "**Interim DIP Note**") payable to Lender, and (b) perform such other acts as may be requested by Lender as necessary or desirable, in Lender's sole and absolute discretion but consistent with the Interim Order, in connection with the DIP Financing and the Interim Order, including, without limitation, the delivery and execution, in connection with a Final Order, of final debtor-in-possession loan documentation acceptable to Lender in its sole and absolute discretion but consistent with the Interim Order and the term sheet (the "**DIP Term Sheet**") attached hereto as **Exhibit C** (collectively with the DIP Note, the "**DIP Loan Documents**").  The Debtors and DIP Lender are negotiating a DIP Credit Agreement, the approval of which will be sought at a Final Hearing;

(iii) authorizing and directing Debtors to (a) pay the principal, interest, fees, expenses, and other amounts payable under the DIP Financing as such become due, including, without limitation, reasonable fees incurred and disbursements made by Lender for attorneys, advisors, accountants, and other consultants, and (b) pay the expenses set forth in the Budget (as hereinafter defined), in each case in accordance with this Interim Order;

(iv) approving, as applicable, Debtors' grant of mortgages, security interests, liens and superpriority claims to the Lender including (a) an allowed administrative-expense priority claim pursuant to section 364(c)(1) of the Bankruptcy Code with priority over all administrative expenses including, without limitation, of the kinds specified in or arising or ordered under

---

[1] Pursuant to the DIP Credit Agreement, all of Debtors are jointly and severally liable for the obligations under the DIP Loan Agreements.

sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1102, 1104, 1113, or 1114 of the Bankruptcy Code or other applicable law, subject only to the Carve Out (as hereinafter defined), (b) valid, binding, continuing, enforceable, unavoidable, and automatically perfected first-priority security interests and liens pursuant to section 364(c)(2) of the Bankruptcy Code (the "**First Super Priority Liens**") on all DIP Collateral (as hereinafter defined), whether now existing or hereafter acquired, of Debtors that was unencumbered by any security interest or lien as of the Petition Date (as hereinafter defined), subject only to the Carve Out, (c) valid, binding, continuing, enforceable, unavoidable, and automatically perfected priming liens pursuant to section 364(d) of the Bankruptcy Code (the "**Priming Liens**" and, together with the First Super Priority Liens, the "**DIP Liens**") on all DIP Collateral, subject only to the Carve Out, in each case as provided herein;

(v) modifying the automatic stay to the extent necessary to implement and effectuate the DIP Note and the Interim Order;

(vi) approving the Debtors and Prepetition Secured Lenders agreement to the consensual use of cash collateral, which consists of funds held in the Debtors' bank accounts or due on checks issued but not cashed;

(vii) approving the grant of replacement liens to the Prepetition Secured Lenders, pari pasu, in consideration for the use of cash collateral and their agreement to allow the First Super Priority Liens for the DIP Lender; and

(viii) scheduling a final hearing (the "**Final Hearing**") to consider entry of a Final Order granting the relief requested in the Motion on a final basis.

24. Pursuant to, and in accordance with, Bankruptcy Rule 4001(b), the following is a concise statement of the material provisions of the DIP Note and the Interim Order.

| Provision | Summary | Location |
|---|---|---|
| DIP Note Parties | Borrowers: Palmaz Scientific, Inc., Advanced Bio Prosthetic Surfaces, Ltd., ABPS Venture One, Ltd., and ABPS Management, L.L.C.<br>Lender: Vactronix Scientific, Inc. | DIP Note at Page 1. |
| Interest rate | The loans under the DIP Facility will accrue interest at the rate of 10% (increasing to 14% upon an Event of Default) per annum with all interest due and payable on the maturity date of the DIP Facility. | DIP Note ¶ 2. |
| Maturity | Earliest of: (a) the later of (1) 120 days after the first advance under the DIP Facility and (2) 60 days after a disclosure statement has been approved by the Bankruptcy Court; (b) the closing and funding of a sale of all or substantially all of the Borrower's property and assets whether pursuant to a sale order under 11 U.S.C. § 363 or a confirmation order under 11 U.S.C. § 1129 or otherwise; (c) the effective date of any confirmed Chapter 11 plan of Borrower; (d) the date on which all amounts under the DIP Facility shall become due and payable in accordance with the Loan Documents (as defined herein); or (e) the date the Borrower pays the DIP Lender all amounts under the DIP Facility in full and terminates the DIP Facility (such earliest date, the "Termination Date"). | DIP Note ¶ 1. |
| Events of default | 1. Material inaccuracy of a representation or warranty when made.<br><br>2. Violation of a covenant, subject to a 10-day grace period for affirmative covenants (and no grace period for negative covenants)<br><br>3. Actual invalidity of any guarantee, security document or subordination provisions or non-perfection of security interest.<br><br>4. Failure by the Borrower to obtain entry, on or prior to the 120th day after the initial advance under the DIP Facility, of either (i) an order in form and substance satisfactory to the DIP Lender approving, the sale of all or substantially all of the Borrower's assets or (ii) within 180 days, an order in form and substance reasonably satisfactory to the DIP Lender confirming a plan of reorganization.<br><br>5. The filing of a plan of reorganization by the Borrower in the Case in a form that fails to pay all obligations under the DIP Facility at the effective date of such plan, unless the DIP Lender consents to alternative treatment in its reasonable discretion.<br><br>6. Dismissal of the Case with respect to the Borrower or conversion of the Case with respect to the Borrower to a Chapter 7 case.<br><br>7. A trustee, receiver, interim receiver or receiver and manager shall be appointed in the Case, or a responsible officer or an examiner with enlarged | DIP Note ¶ 3. |

| Provision | Summary | Location |
|-----------|---------|----------|
| | powers shall be appointed in the Case (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)); or any superpriority administrative expense claim or lien (other than the Carve-Out) which is pari passu with or senior to the claims or liens of the DIP Lender shall be granted without the consent of the DIP Lender. | |
| | 8. Failure of the Borrower to have the exclusive right to file a plan of reorganization in the Case. | |
| | 9. (i) Failure of Borrower to comply with the terms of any DIP Order, (ii) any DIP Order shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of the DIP Lender, (iii) the Borrower shall file a motion for reconsideration with respect to any DIP Order, or (iv) the right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court. | |
| | 10. The Borrower shall file, or support, any motion seeking to disallow, invalidate, subordinate, reduce, or otherwise impair, in whole or in part, the Liens or super-priority claims granted with respect to the DIP Facility. | |
| | 11. Entry of an order invalidating, subordinating, reducing, or otherwise impairing , in whole or in part, the liens or super-priority claims granted with respect to the DIP Facility. | |
| | 12. The Borrower shall file or support any motion seeking to allow, or any order shall be entered allowing, any action that would violate any covenant or condition contained in the Loan Documents. | |
| | 13. The Borrower shall file, or support, any motion seeking, or any order shall be entered granting, any relief that is adverse to DIP Lender's interests, rights and remedies under any Loan Document or DIP Lender's interest in any Collateral. | |
| | 14. Granting of relief from the automatic stay in the Case (i) to permit foreclosure on any assets of the Borrower having an aggregate value greater than $250,000 or (ii) to permit other actions that would have a material adverse effect on the Borrower or its estate. | |
| | 15. Failure of the Borrower to pay any post-petition trade payables or other post-petition obligations on a current and within the particular payment terms governing such trade payables. | |
| | 16. The Borrower shall have deviated from the Budget during any four week period, commencing with the four week period ended April 8, 2016, by more than 15% of the budgeted disbursements, either on a | |

| Provision | Summary | Location |
|-----------|---------|----------|
| | cumulative basis or by 15% with regard to any specific budgeted line item. | |
| | 17. The Borrower shall expend cash or incur credit for capital expenditures without prior written approval from the DIP Lender. | |
| | 18. Filing of a motion, pleading or proceeding by the Borrower or its affiliates which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in a material impairment. | |
| | 19. Change of ownership or control of the Borrower. | |
| | 20. Judgment defaults. | |
| Liens | All obligations of the Loan Parties under the DIP Facility at all times will be given superpriority claim status and will be secured by a first priority perfected senior security interest in and lien on (a "<u>Lien</u>") all property and assets (tangible, intangible, real, personal or mixed) of the Loan Parties, whether now owned or hereafter acquired, including, without limitation, accounts, cash, deposit accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, causes of action, insurance, and other general intangibles, and all products and proceeds thereof (the "<u>Collateral</u>"), as follows:<br><br>(a)    pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Orders (as applicable), all such obligations shall be secured by a perfected first priority senior Lien on all unencumbered Collateral, subject only to the Carve-Out;<br><br>(b)    pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Orders (as applicable), all such obligations shall be secured by a perfected first priority senior priming Lien on all Collateral, subject only to the Carve-Out;<br><br>(c)    pursuant to Section 364(c)(1) of the Bankruptcy Code and the DIP Orders (as applicable), all such obligations at all times shall constitute allowed super-priority administrative expense claims in each Case having priority over all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code, subject only to the Carve-Out; and<br><br>(d)    except for the Carve-Out, no costs or expenses of administration shall be imposed against the DIP Lender or any of the Collateral under Section 105 or 506(c) of the Bankruptcy Code, or otherwise, and each Loan Party | Interim Order ¶¶ 2, 7. |

| Provision | Summary | Location |
|---|---|---|
| | hereby waives for itself and on behalf of its estates in bankruptcy, any and all rights under Section 105 or 506(c), or otherwise, to assert or impose or seek to assert or impose, any such costs or expenses of administration against the DIP Lender or the Collateral.<br><br>The Carve Out shall be comprised of (i) the allowed fees and expenses of bankruptcy professionals whose retention has been approved by the Bankruptcy Court that are accrued or incurred before the occurrence of an Event of Default or the Termination Date (regardless of whether allowed before the date of such Event of Default or Termination Date) and (ii) fees under 28 U.S.C. § 1930 or owed to the clerk of the Bankruptcy Court (collectively, the "Carve Out"), provided that in no event will the Carve Out exceed the Commitments. Nothing herein shall be construed to impair the ability of any party to object to the fees and expenses described above. No portion of the Carve-Out, any cash collateral or proceeds of the DIP Facility may be used for the payment of the fees and expenses of any person incurred challenging, or in relation to the challenge of, (A) any of the lenders' liens or claims, or the initiation or prosecution of any claim or action against any lender, including any claim under Chapter 5 of the Bankruptcy Code, in respect of any of the existing secured credit facilities as described in Annex III hereto (the "Prepetition Secured Obligation") other than to fund (1) an investigation by any official committee of unsecured creditors appointed in the Case concerning whether the Existing Secured Facilities may be subject to avoidance or other challenge under applicable provisions of the Bankruptcy Code and (2) if there is no such committee, a similar investigation by the Borrower, in each such case at a cost of not more than $50,000; and (B) any claims or causes of actions against any lender under the Existing Secured Facilities, their respective advisors, agents and sub-agents, including formal discovery proceedings in anticipation thereof, and/or challenging any Lien of any lender under the Existing Secured Facilities. Notwithstanding the foregoing, the Debtors for purposes of the Interim, subject to the challenge period, stipulate to the enforceability and validity of the Prepetition Secured Obligations.<br><br>All of the Liens described herein securing the DIP Facility shall be effective and perfected as of the entry of the Interim DIP Order, and shall be maintained as effective and perfected, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. | |
| Borrowing limits | $2 million | DIP Note at Page 1. |
| Other | | |

## A.    <u>Fed. R. Bankr. P. 4001(c)(B)(i)-(xi) Requirements</u>

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| A grant of priority or a lien on property of the estates under §364(c) or (d) | | Interim Order ¶ 2(i) | Yes, to the extent of the interim draw amount |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estates to secure the claim, or the use of property of the estates or credit obtained under §364 to make cash payments on account of the claim | Prepetition secured lenders will receive replacement liens for use of cash collateral or for diminution in the value of Prepetition Secured Collateral. | Interim Order ¶ 4 | |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | Subject to challenge period as set forth in the proposed order, 75 days from petition date for Debtors and other parties in interest, unless an Official Unsecured Creditors Committee is appointed, in which case the Committee will have 60 days from its appointment to make a challenge. | Interim Order ¶ 6 | |
| A waiver or modification of Code provisions or applicable rules relating to the automatic stay | As needed to perfect liens granted pursuant to interim and/or final relief. | Interim Order ¶ 14 | |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under §363(c), or request authority to obtain credit under §364 | NA | | |

| Provision | Summary | Location | In effect if interim approval is granted, but final relief is denied? |
|---|---|---|---|
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | | Interim Order ¶ 19(d) | |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien; | | Interim Order ¶ 5 | |
| A release, waiver, or limitation on any claim or other cause of action belonging to the estates or the trustee, including any modification of the statute of limitations or other deadline to commence an action | Challenge periods established as to stipulations regarding Prepetition Secured Obligations | Interim Order ¶ 6 | |
| The indemnification of any entity | NA | | |
| A release, waiver, or limitation of any right under §506(c) | | Interim Order ¶¶ 2(*l*), 4(i)-(ii), 8 | |
| The granting of a lien on any claim or cause of action arising under §§544, 545, 547, 548, 549, 553(b), 723(a), or 724(a). | NA | | |

## VII.
## RELIEF REQUESTED

25.     Debtors hereby requests entry of the Interim Order, the scheduling of a final hearing, and, after such hearing, the entry of a Final Order granting the following relief:

A.    **Debtors' Need for Financing**

26.    The requested relief is necessary for Debtors to continue the operation of their business as Debtors-in-Possession and to preserve the value of their assets for a potential sale for the benefit of their creditors and respective estates.   Debtors will suffer immediate and irreparable harm unless they are immediately authorized to obtain financing in the amount and on the terms and conditions set forth in the Interim Order and in the DIP Note.

27.    Subject to the terms and conditions set forth in the Interim Order, the Lender is willing to provide up to $2,000,000 in Final DIP Financing to allow Debtors to continue to operate, maintain their key employees, and maintain the value of their assets.

B.    **Summary of Relief Sought**

28.    The Debtors seek the entry of an interim order (i) authorizing the Debtors to obtain the DIP Financing and enter into the DIP Note, (ii) approving the Debtors' grant, as applicable, of mortgages, security interests, liens, and superpriority claims to the Lender, (iii) modifying the automatic stay to the extent necessary, (iii) approving the consensual use of cash collateral; (iv) the granting of replacement liens as adequate protection to Prepetition Secured Lenders;  and (iv) scheduling a Final Hearing.

29.    A condition to the willingness of the Lender to fund the DIP Note is that, as security for the prompt payment and performance of the DIP Obligations, the Lender receives (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first-priority, perfected lien upon all of the DIP Collateral, and (ii) pursuant to Section 364(d) of the Bankruptcy Code, the Priming Liens on all DIP Collateral, subject only to the Carve Out.   In consideration for consenting to such liens, the Prepetition Secured Lenders seek replacement liens as adequate protection for consensual use of cash collateral and any diminution in the value of Prepetition Secured

Collateral as well as the establishment of the challenge periods to the enforceability, priority and validity of their Prepetition Secured Obligations.

30.     The DIP Liens shall not attach to any causes of action, including causes of action or claims pursuant to Sections 506(c), 544, 545, 546, 547, 548, 549, or 550, or 553 of the Bankruptcy Code and the proceeds of such actions.  Nothing in the proposed Interim Order is intended to grant liens that prime liens securing *ad valorem* taxes assessed against any piece of the DIP Collateral that was due and owing to the applicable state or local taxing authority under applicable state law.

31.     Pursuant to the Interim Order, all DIP Obligations will be granted administrative priority in accordance with, and shall constitute an allowed super-priority claim (the "**Super-Priority Claim**") pursuant to Section 364(c)(1) with priority over all other administrative expenses in the Debtors' consolidated bankruptcy case of the kind specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(6), 507(a), 507(b), 546(b), 546(c), 726, 1114, or other similar section of the Bankruptcy Code.

32.     The Lender has stipulated and agreed to the Debtors' use of the proceeds of the DIP Financing during the term of this Interim Order exclusively in accordance with the terms, conditions and limitations set forth in the Interim Order, the budget attached hereto as **Exhibit D** (the "**Budget**"), and the DIP Note.

33.     Further, no costs or administrative expenses which have been or may be incurred in this Chapter 11 case, in any proceedings related hereto or in any successor Chapter 7 case, and no priority claims are or will be prior to or on a parity with the Super-Priority Claim of the Lender against the Debtors arising under the DIP Note or the Interim Order, except for the

Carve-Out for professional fees as set forth in the Budget and for fees payable to the U.S. Trustee and to the Clerk of the Court.

34.     The Debtors believe that good cause has been shown for the entry of the Interim Order to obtain the DIP Note pending a final hearing on the relief requested herein pursuant to Bankruptcy Rules 4001(c) and (d).  The Debtors' need for financing of the type requested herein and as afforded by the Interim Order is immediate and critical. Entry of the Interim Order will minimize disruption of the Debtors' operations, will preserve the assets of the Debtors' estate, and is in the best interests of the Debtors, their creditors, and their estates.  The Debtors further believe that the terms of the financing are fair and reasonable, reflect the Debtors' reasonable exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.  The interests of the pre-petition lenders in their pre-petition collateral are adequately protected under the terms and conditions of the Interim Order and the proposed interim cash collateral order.  All pre-petition lenders further consent to the priming of their respective pre-petition liens by the Lender according to the terms set forth in the Interim Order.

## VIII.
## ARGUMENT AND AUTHORITIES

### A.      Debtors Should Be Authorized to Obtain Post-Petition Financing.

35.     As described above, it is essential to Debtors' operations and value of their assets that it be granted immediate access to funds.  Absent access to the working capital financing that will be available to Debtors under the proposed DIP Loan on an interim basis, Debtors will be unable to maintain their business operations or preserve the value of their assets.

36.     Debtors believe that the terms and conditions of the DIP Note, the proposed Interim Order, and the related relief requested herein are fair, reasonable, and in the best interests of Debtors, their estate, and their creditors.

**B.**      **Post-Petition Financing; Code Sections.**

37.      Section 364(b) of the bankruptcy code provides:

> (b)  The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

> 11 U.S.C. § 364(b).

38.      Section 364(c) of the bankruptcy code provides:

> (c)  If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt  (1)  with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; (2)  secured by a lien on property of the estates that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estates that is subject to a lien.

> 11 U.S.C. § 364(c).

39.      Debtors are unable to obtain unsecured credit or to incur unsecured debt allowable 11 U.S.C. § 503(b)(1) as an administrative expense pursuant to 11 U.S.C. § 364(b).  Debtors seek authorization to obtain credit or to incur debt with priority over any or all administrative expenses of the kind specified 11 U.S.C. §§ 503(b) or 507(b) pursuant to 11 U.S.C. § 364(c)(1). Debtors seek authorization to obtain credit or to incur debt secured by a lien on property of the estates that is not otherwise subject to a lien pursuant to 11 U.S.C. § 364(c)(2).  Debtors seek authorization to obtain credit or to incur debt secured by a junior lien on property of the estates that is subject to a lien pursuant to 11 U.S.C. § 364(c)(3).

40.      Section 364(d)(1) of the bankruptcy code provides:

> (d)  (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estates that is subject to a lien only if (A)  the trustee is unable to obtain such credit otherwise; and (B)  there is adequate protection of the interest of the holder of the lien on the property of the estates on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

41.     Debtors are unable to obtain credit or to incur debt pursuant to 11 U.S.C. § 364(b) or (c).  With the consent of the Debtors pre-petition lenders, Debtors seek authorization to obtain credit or to incur debt secured by a senior or equal lien on property of the estates that is subject to a lien pursuant to 11 U.S.C. § 364(d)(1).  Debtors contend that there is adequate protection of the interest of the holder of the lien on the property of the estates on which such senior or equal lien is proposed to be granted.

**C.     Approval Under Section 364.**

42.     Bankruptcy Code § 364 allows Debtors to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, and (c) obtain credit with specialized priority or with security.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize the obtaining of credit or the incurring of debt, repayment of which is entitled to super-priority administrative expense status or is secured by a lien on unencumbered property, or a combination of the foregoing.

43.     Debtors proposes to obtain financing under the DIP Note, the Interim Order, and the Final Order by providing security interests in and liens on the DIP Collateral pursuant to Bankruptcy Code § 364.  The statutory requirement for obtaining post-petition credit under Section 364 is a finding, made after notice and hearing, that Debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code]."  *In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992) (the debtor must show "by a good faith effort that credit was not available without" the protections of Section 364(c)).  Section 364 financing is appropriate when the trustee or debtor-in- possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.  *See In re Crouse Group, Inc.*, 71 B.R. 544, 549, *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (secured credit

under Section 364(c)(2) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

44.     Courts have articulated a three-part test to determine whether a debtor is entitled to Section 364(c) financing: (i) The debtor is unable to obtain unsecured credit under Section 364(b) (i.e., by allowing a lender only an administrative claim); (ii) The credit transaction is necessary to preserve the assets of the estate; and (iii) The terms of the transaction are fair, reasonable, and adequate given the circumstances of the debtor and the proposed lender.  *See Crouse Group*, 71 B.R. at 549. Additionally, courts will generally accord significant weight to the necessity of the debtor obtaining post-petition financing in order to remain viable.  *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

45.     As noted above, the need for Debtors to obtain financing is critical.  Further, the evidence at the interim hearing will show that a DIP Note of the type needed in this Chapter 11 case could not have been obtained on an unsecured basis.

i.     Debtors Do Not Have an Alternative to the DIP Note and the Interim Order.

46.     If necessary, the evidence at the interim hearing will show that DIP Financing of the type needed in this case could not have been obtained on an unsecured basis.  Indeed, the potential sources of a credit facility for the Debtors, obtainable on an expedited basis and on reasonable terms, are practically nonexistent. In these circumstances, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d at 1088. 36.  A debtor needs only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c). *Id.; In re Plabell*, 137 B.R. at 900.  Where there are few lenders likely to be able and/or willing to extend the

necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom, *Anchor Say. Bank FSB v. Sky Valley*, 99 B.R. 1997, 120 n.4 (N.D. Ga. 1989). Thus, the evidence introduced at the interim hearing will satisfy the requirement of Section 364(c) that unsecured credit was unavailable to Debtors.

47. Because of the Debtors' acute liquidity crisis, the status of the Debtors' operations and collateral base, the need to maintain their key employees, and the impracticability of pursuing (and paying for) numerous prospective lenders, it was not practicable to try to "shop" the DIP Note to other possible lenders prior to the Petition Date. The Lender is an entity related to current equity holders and the Prepetition Secured Lenders. As a result, they are intimately familiar with the Debtors' business operations, corporate structure, financing arrangements, and collateral base, and has already performed the necessary due diligence in connection with the DIP Note, was able to offer DIP financing to meet the Debtors' working capital needs on the terms, and within the time frame, that the Debtors needed.

ii.  <u>The DIP Financing is Necessary to Preserve the Assets of the Estates.</u>

48. The Court should authorize Debtors to enter into the DIP Note and obtain the DIP Financing as an exercise of Debtors' sound business judgment. Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In*

*re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Cases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("the applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of sound and reasonable business judgment . . . .").

49.    Debtors' management exercised their best business judgment in negotiating the DIP Note and the Interim Order that is presently before the Court.  Debtors negotiated the DIP Note with the DIP Lender in good faith, at arm's-length, and with the assistance of outside counsel, to obtain the required postpetition financing on terms favorable to Debtor.

50.    Accordingly, Debtors and their advisors determined in their sound business judgment that the DIP Note provides a greater amount of financing on more favorable terms than any other reasonably available alternative.  As noted above, the DIP Note will provide Debtors with access to the necessary liquidity, which Debtors and their advisors have independently determined should be sufficient to support Debtors' ongoing operations and reorganization activities through the pendency of the Chapter 11 Case.  Thus, Debtors submits that entering into the DIP Note constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

iii.    The Terms of the DIP Note are Reasonable.

51.    As described above, Debtors have agreed, subject to Court approval, to pay certain fees to the Lender in exchange for providing the DIP Note.  Specifically, Debtors will pay

to the Lender an origination fee equal to $40,000. Additionally, the Lender shall be entitled to reimbursement of its reasonable and documented out-of-pocket expenses related to the DIP Financing, including, without limitation, attorneys' fees and expenses.

52. The fees, taken together with the other provisions of the DIP Loan Documents, represent the most favorable terms to Debtors on which the Lender would agree to make the DIP Note available. Debtors considered the fees described above when determining in their sound business judgment that the DIP Note constituted the best terms on which Debtors could obtain the postpetition financing necessary to continue their operations and prosecute the Chapter 11 Case. Debtors believe that paying these fees to obtain the DIP Note is in the best interests of Debtors' estate, creditors, and other parties in interest. Accordingly, the Court should authorize Debtors to pay the fees provided under the DIP Note and the proposed Interim Order.

**D.    Modification of the Automatic Stay Is Warranted.**

53. The DIP Note and the proposed Interim Order contemplate that the automatic stay arising under Bankruptcy Code § 362 shall be vacated or modified to the extent necessary to permit the Lender to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the Interim Order), all rights and remedies provided for in the DIP Note, and to take various other actions without further order of or application to the Court. Debtors submits that stay modification provisions of this sort are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Interim and Final Orders.

**E.    The Lender Should be Deemed a Good Faith Lender under § 364(e).**

54. Bankruptcy Code § 364(e) protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the

debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that: [t]he reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal. 11 U.S.C. § 364(e).

55.     The DIP Financing offered by the Lender is the result of arm's-length, good faith negotiations between the Debtors and the Lender. The terms and conditions of the DIP Note are fair and reasonable, and the proceeds under the DIP Note will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Note other than as described herein.

56.     Accordingly, the Court should find that the Lenders is a "good faith" lender within the meaning of Bankruptcy Code § 364(e) and is entitled to all of the protections afforded by that section.

**F.      Interim Approval of the DIP Note.**

57.     Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant to Section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

58.     Pursuant to Bankruptcy Rules 4001(c) and (d), Debtors request that the Court conduct an expedited interim hearing on the date hereof or as soon as practicable to consider entry of the Interim Order authorizing Debtors to borrow an amount sufficient to fund their operating expenses pending the Final Hearing on the DIP Financing.  The Court may grant interim relief in respect of a motion filed pursuant to Bankruptcy Code § 364 where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estates pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

59.     Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.   Indeed, as explained in the First Day Declaration, unless the Court approves the Debtors' interim access to the DIP Financing, the Debtors will not have access to any cash whatsoever.  Accordingly, Debtors have an immediate need for access to liquidity to, among other things, permit the orderly continuation of the operation of their business, to make payroll, and to satisfy other working capital and operation needs, all of which are required to preserve and maintain Debtors' going concern value for the benefit of all parties in interest.

60.     Accordingly, for all of the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## IX.
## REQUEST FOR FINAL HEARING

61.     Pursuant to Bankruptcy Rule 4001(c)(2), Debtors request the Court to set a date for the Final Hearing.

## X.
## WAIVER OF BANKRUPTCY RULES ABOUT NOTICE AND STAY OF AN ORDER

62.    To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of an order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h), or otherwise.

## XI.
## NOTICE

63.    On January 19, 2016, Debtors served copies of the Motion and notice of the Interim Hearing to all creditors and parties in interest entitled to such notice in compliance with Bankruptcy Rules 4001(b) and (c) and the Local Rules, including: (i) the Office of the U.S. Trustee for this District, (ii) those creditors holding the twenty (20) largest unsecured claims against Debtors' estate, (iii), (iv) and its counsel, and (v) any other secured parties of record.

## XII.
## PRAYER

WHEREFORE, Debtors request that this Court grant its Motion, and grant such other and further relief to which Debtors may be entitled both at law and in equity.

Dated: March 4, 2016                     Respectfully submitted,

                                         **NORTON ROSE FULBRIGHT US LLP**


                                         By _____*/s/ Michael M. Parker*_____
                                             Michael M. Parker
                                             Bar No. 00788163
                                             michael.parker@nortonrosefulbright.com
                                             Steve A. Peirce
                                             Bar No. 15731200
                                             steve.peirce@nortonrosefulbright.com

                                         300 Convent Street, Suite 2100
                                         San Antonio, TX  78205-3792
                                         Telephone:     (210) 224-5575
                                         Facsimile:     (210) 270-7205

                                         **PROPOSED COUNSEL FOR PALMAZ
                                         SCIENTIFIC INC.**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that contemporaneously with the filing of the foregoing, I directed noticing agent UpShot Services, LLC to serve a copy of the foregoing on parties in interest in this case. Debtors will supplement this certificate of service with a copy of such service list.


                            */s/ Michael M. Parker*___